Herbert C. Sanderson and Gladys L. Sanderson v. Commissioner.
Sanderson v. Commissioner
Docket No. 94994.
United States Tax Court
T.C. Memo 1964-284; 1964 Tax Ct. Memo LEXIS 56; 23 T.C.M. (CCH) 1723; T.C.M. (RIA) 64284; October 28, 1964
*56 Held, taxpayers were engaged in the business of breeding, raising, racing, showing, and selling horses during the years 1957, 1958, and 1959 and may deduct their losses incurred in that business. Thomas E. Smail, Jr., for the petitioners. Leslie M. Hartman, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years 1957, 1958, and 1959 in the respective *57 amounts of $2,710.45, $14,727.76, and $8,329.50. The parties are in agreement [1] as to the disposition of all issues originally raised in the pleadings except one. The issue remaining for decision is whether petitioners operated their farm during the years involved as a trade or business so that the net losses incurred therein are deductible under sections 162 or 165 of the Code. [2] The losses, in the amounts of $412.22, $10,708.78, and $12,472.37, respectively, were incurred in breeding, raising, racing, showing, and selling horses owned by petitioners. Findings of Fact The stipulated facts are found accordingly and are included herein by reference. Petitioners, Herbert C. and Gladys L. Sanderson, who will be referred to as Herbert and Gladys, respectively, are husband and wife who reside in Sacramento, Calif. They filed joint Federal income tax returns for the taxable years 1957, 1958, and 1959 with the district director of internal revenue, *58 San Francisco, Calif.
During the period under review, Herbert was an orthopedic surgeon practicing in Sacramento. He was 51 years old in 1957. After graduation from high school, Herbert, who had no family, became an apprentice, and later a journeyman, electrician. He worked at this trade for 5 years, saving money for a college education. He became a student at Stanford University where he washed dishes and worked part time as an electrician to support himself in school. He received A.B. and M.A. degrees from Stanford and decided that he wanted to go to medical school. He thereupon completed necessary premedical courses and worked as an electrician prior to entering medical school at Northwestern University in 1936. He worked as an electrician on construction projects and at shipyards during the summer vacations while he was in medical school and was able to support himself in medical school until graduation when he began internship and later residency in orthopedic surgery. Gladys was brought up with horses, her grandfather having owned one of the largest racehorse ranches in the United States. After graduation from college she worked about 7 years as superintendent of a juvenile *59 hall in San Diego and then moved to San Francisco, where she and Herbert were married. While Herbert was overseas during World War II, Gladys worked in supervisory positions with the OPA, where she had considerable administrative and bookkeeping experience. After the war petitioners moved to Sacramento where Herbert established his medical practice and Gladys engaged in community activities until their children were born. In 1957 petitioners had three children, James, Stephen, and Cynthia, who were then about 10, 8, and 3 years of age, respectively. In 1957, Herbert, realizing that he could not continue the practice of surgery in older age, considered what business he might enter that would provide him with a living after retirement from full-time medical practice. He was accustomed to working full time, and did not want to retire and become inactive at any age. He discussed the matter with Gladys, and they considered several possibilities, including the business of breeding horses. With respect to the latter they sought the advice of a friend, Leone Hart (hereafter referred to as Leone), who lived in Sacramento and who was a licensed trainer of racing horses and an experienced *60 judge at horse shows. Leone had been associated with horses for many years and had bred polo ponies before World War II. She had also played polo extensively. After World War II, polo declined in popularity, and Leone, who owned brood mares by which she had bred the ponies, began studying blood lines and found that her mares could be used to breed racehorses. She thereupon went into the business of breeding and racing horses and obtained a trainer's license. She and her husband realized a net profit from this business in the first years of its operation, but they sustained losses in other years. In answer to their questions, Leone advised petitioners that she thought they could make a profit in breeding, racing, and selling horses if they conducted the operation properly. They discussed the matter in detail. Leone advised petitioners that if they wanted to get into the business for profit they would have to live outside the city in an area where they could maintain horses at their home. She also told them that the first thing to do to begin the business would be to purchase a good mare with a foal at her side and to breed the mare soon; that they would have to study the blood lines *61 on horses that were currently winning races; and that they would have to build up their pasture for good nutrition for their horses. She told them they should retain an accountant to establish and maintain a set of books for them in order that their costs could be carefully recorded and minimized, and suggested that Gladys, who had bookkeeping experience, could keep the records for the operation at the farm. She also discussed with them the items of cost in such an operation and wherein they could do part of the work themselves to cut some of the costs, emphasizing that the costs at a racetrack were rather fixed but that costs could be saved at the farm. Leone also advised that in order to make such a venture profitable it was necessary to gain a reputation as a breeder of good horses, which could be established by entering horses in races and horse shows so their performance records and blood lines would become known, and to train their children to ride and show the horses so potential buyers would feel that their own children could also handle the horses. And finally, she discussed with them the various sources of realizing income from such a venture and setting up a program which *62 would make all of these sources available, emphasizing that if a horse bought or bred for racing was not too successful at the track, he might nevertheless be trained to become a good jumper or show horse, or even a good riding horse that would sell, provided the blood lines were good and the horse received good nutrition and was properly trained. She indicated that it would take time to develop a successful operation such as this unless the operator was willing to pay large prices to buy stallions and brood mares that were already proven to start with, and that even then they might incur losses in the early years until the foals became of age to race, show, or sell. After discussing the matter with Leone and others in the horse-raising business, Herbert contacted a realtor in Sacramento and told him that he was going into the business of breeding horses and asked him to find a suitable place near Sacramento where he and his family could live and maintain horses. The broker found a 9-1/2-acre plot about 12 miles from Sacramento and recommended it to petitioners. In September 1957, petitioners bought the unimproved acreage for $21,015.20 and used two tractors to grade the land to *63 correct a drainage problem and to prepare to land for permanent pasture. In May 1958, petitioners purchased an adjoining tract of 4-1/2 acres at a cost of $23,757.70. This tract was improved with a long building consisting of box stalls for horses in the center, with a tack room at one end and a kitchencile (6foot X 7foot), a small bedroom, and a bath at the other end. Also in May 1958, petitioners sold their residence in Sacramento for $55,000, put their furniture in storage, and moved to the location which they had purchased. They lived first in the building and later in a trailer at the farm pending completion in June 1960 of a house which they built on the property at a cost of $46,498.91. Petitioners acquired two adjacent tracts in November 1958, one consisting of.834 of an acre and the other of 1.277 acres, at a combined cost of $6,145.69. The total cost of the realty purchased by petitioners was thus $50,918.59, exclusive of the improvements they built thereon. They had the property surveyed to separate the residential property from the farm property. Separate tax assessments are made and separate tax bills rendered for petitioners' home and for the remaining portion of the *64 property. After the construction of petitioners' house, their living room overlooked the stalls which were nearby. They had a horse barn with rough-lumber siding, a dirt floor, and a tarpaper roof. They did not have a barn for hay, which was stacked under tarpaulin. The house was approached by a dirt road. The grounds surrounding the house were not landscaped and were not generally attractive. There was high grass and undergrowth, and the only marker for the house was petitioners' name on a rural mailbox. The property was not a showplace. After buying the property petitioners followed the advice they had received. They employed an accountant to keep their books and make their tax returns for them. Gladys kept records of all receipts and expenditures at the farm, carefully separating expenditures for the farm operation and those for the home, and turned these over to the accountant from time to time, who made the entries in books based on Gladys' breakdown unless questions arose. They first acquired a gelding which they showed for a while before retiring him to pasture. Shortly thereafter in 1957 they acquired a mare, which was later sold, and another mare which they raced several *65 times and then sold. In 1958 they acquired four brood mares, two of them with foals, and also a gelding, which developed into a good jumping horse. The mares were then bred to stallions with blood lines having the desired characteristics to produce racing horses with jumping potential as well, and good conformation. Some of the foals were raced or shown and then sold, but the majority of the [*] produced by [*] the [*] [*] petitioners acquired them were still owned by petitioners at the time of the trial and were too young to have developed into good racing or show horses. Petitioners' inventory of horses, with information as to the amount paid for each, the date acquired by petitioners, the sex, whether or not sold, the selling price if sold or the potential value if owned at the date of the hearing, and the year in which sold, is as follows: See Table in orignal.
[n1] Amounts of potential values are based on testimony of an expert trainer who was generally familiar with petitioners' horses. These values were necessarily speculative in some cases and, we think, optimistic with respect to several horses. Therefore, we have found only "potential values," which depend upon favorable circumstances and the further development of certain horses. [n2] Play Boy and Firefly were traded for an $800 equity in a 1957 Ford truck. [n3] Potential value if sold in foal. [n4] Value at date contributed to University of California at Davis.
*66 Petitioners also followed Leone's advice in having their sons trained to show horses. They were trained by Barbara Worth, who is one of the best known horsewomen in the country and who operates a large stable for training and housing show horses and riders in Sacramento. They learned to ride, jump, show, and care for horses. They took horses to shows and rode them. Stephen's showing of Mio San was instrumental in her sale in 1963. At the date of the hearing James had Matador with him at a private school at Pebble Beach, Calif., but Matador had been advertised for sale with a picture of him being ridden over a jump by James. The boys understood that any time they showed a horse it might be sold immediately thereafter. Only two of the horses which were owned by petitioners were available for the boys to ride at home. Petitioners also sought and paid for the advice and services of Barbara Worth in training and selling their horses. During the years in question, Herbert practiced medicine full time. He was in his office 3 days a week, was on the staff of several hospitals in the Sacramento area, and was often an expert witness in court cases in the vicinity. He sometimes did not *67 arrive home until 8:00 p.m. However, after deciding to engage in the business of racing, breeding, and showing horses, he devoted extensive study to blood lines of his and other racing horses and to the nutrition and feeding of horses, a subject in which he was particularly interested. He became familiar with these subjects to the point where he became known to professional trainers in the area as a competent horse breeder. He spent considerable time with his horses overseeing their feeding and development, caring for them when they were sick, deciding when they should be raced or bried, and doing chores at the stable in the evenings and on weekends. Herbert became a member of several associations representing thoroughbred horse owners. He also became acquainted with the director of racing for the California State Fair, and took an active part in the affairs of these organizations. He made various suggestions with respect to the use of facilities at the fair grounds which were beneficial to the horse owners and was chosen to represent the Thoroughbred Breeders Association in settling several disputes. He thus gained a State-wide reputation as a knowledgeable and serious owner of *68 racing horses. Gladys has not ridden since the farm was acquired; Herbert rode only occasionally and had not ridden for about 6 months preceding the hearing. But Gladys took an active interest in the business of breeding, racing, and showing the horses. Gladys also acquainted herself with the business and worked at it. She had no household help, and petitioners never employed more than one handyman at a time in the business. Gladys did much of the work of maintaining the horses by herself. She cleaned stalls, walked horses with the colic, and performed other chores connected with the business. She hired and fired employees and paid bills. The decisions as to when to race, breed, or sell a horse were made jointly by Gladys and Herbert. Gladys and her sons did most of the work keeping the grounds around the house in shape. Gladys and Herbert did not entertain at their home and did not enter into many of the social activities of the other horse owners and breeders in the area. Petitioners' gross income, expenses, and net losses in their horse venture were as follows for the following periods: Gross
Period
income
Expenses
Net loss
1957
$ 938.80
$ 1,351.02
($ 412.22)
1958
566.50
11,275.28
(10,708.78)
1959
401.00
12,873.37
(12,472.37)
1960
800.00
12,047.42
(11,247.42)
1961
1,415.00
27,267.57
(25,852.57)
1962
1,200.00
16,846.59
(15,646.59)
Jan. 1-Aug.
31, 1963
6,225.00
16,883.62
(10,658.62)
*69 Classification of items of gross income is as follows: Breeders'
Period
Racing
Shows
Sales
awards
1957
[1] $938.80
1958
$ 220.00
[1] 250.00
$ 96.50
1959
401.00
1960
[2] 800.00
1961
1,415.00
1962
1,200.00
Jan. 1-
Aug. 31,
1963
$1,615.00
$4,500.00
$110.00
Herbert realized net income in 1957, 1958, and 1959 from his medical practice in the respective amounts of $45,885.09, $51,606.74, and $54,267.22. The value of petitioners' real estate at the time of trial had increased almost threefold over what they paid for it. Ultimate Findings Petitioners were engaged in the trade or business of breeding, raising, racing, showing, and selling horses during the taxable years 1957, 1958, and 1959. They are entitled to deduct the losses incurred in this business in the respective amounts of $412.22, $10,708.78, and $12,472.37 in the taxable years 1957, 1958, and 1959. Opinion The only issue for decision is whether petitioners are entitled to deduct, for the taxable years 1957, 1958, and *70 1959, the losses which they incurred in breeding, raising, showing, racing, and selling horses. The resolution of the issue depends upon whether petitioners' operations constituted a trade or business so that the expenses incurred in the venture are deductible under section 162 or the losses are deductible under section 165. [3]
There is little dispute between the parties about the controlling law. Both recognize that to be deductible under either section 162 or section 165 the expenditures or losses must have been incurred in the taxable year in carrying on a trade or business. Section 1:165-6(a)(3), Income Tax Regs., provides that a loss incurred in the operation of a farm for recreation or pleasure shall not be allowed as a deduction from gross income. Section 1.162-12 of the regulations concludes: If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses *71 incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. * * * Breeding, racing, showing, and raising horses for sale may constitute a trade or business. (C.A. 3, 1929), affirming ; ; ; . But whether it does in a particular case is to be determined by whether the taxpayer engaged in the venture with the intention of conducting it as a business with the motive and purpose of realizing a profit ; The question is a factual one to be answered upon a review of the entire record, since the taxpayer's intent is best illustrated by his efforts toward making the operation profitable and reducing losses. See , *72 affd. (C.A. 9, 1958); . This Court recognized at an early date that breeding racehorses is a financially hazardous undertaking. . But we nevertheless recognized that losses sustained in the first years of operation of such a venture are allowable as deductions if there is the requisite profit motive. In , affd. (C.A. 2, 1933), the Board said: If the taxpayer operates a farm with the intention of making a profit and not merely "as a place of pleasure, exhibition, and social diversion" ( ), the fact that losses may be sustained from the operation of the farm does not change the character of the enterprise from one operated for profit to one not operated for profit. A series of losses, while undoubtedly a very material factor for our consideration in this case, does not in itself make a hobby out of a business. ; ; ; *73 . But the burden is on petitioners to show that they conducted this horse venture as a business with a genuine intention of earning a profit. . Based on the facts which we have outlined in some detail in our Findings of Fact and the record as a whole, and from our observation of petitioners and the other witnesses as they testified at the trial, we have found as an ultimate fact that petitioners' operation of the horse venture in 1957, 1958, and 1959 did constitute a business, and that finding is dispositive of this issue. We believe the testimony of both Herbert and Gladys was truthful as well as candid. They testified that they went into the venture to operate it at a profit, although they realized they might lose money, but not so much, at the outset, that they continued in the venture with that object in mind, and that they thought they would soon realize a profit on it. Other reputable witnesses, who were not only closely connected to the horse-breeding business but also were quite familiar with petitioners' operations, testified that petitioners were serious *74 and businesslike in the conduct of the venture and sought every way possible to improve their animals and cut costs. Petitioners sought the advice of people experienced in the business before they started into the venture, and they followed the advice of these people throughout the years before us. Gladys worked long and hard at operating the farm, and Herbert spent most of his spare time either studying blood lines and devising feeds that would increase the stamina and benefit the bone structure of the horses, or in working at the farm or going to the racetracks with the horses. They spent money to have their sons trained to ride and show the horses because they were advised this would help sell the horses. Neither Gladys nor Herbert rode the horses to any extent and it is difficult to visualize how they could have gotten much recreation and pleasure out of the venture. They did not entertain at the farm - nor was it maintained as a showplace. They did not enter into the social activities of the "horsy set." They did what was required to become known as breeders of good horses, but not in a recreational way. They kept apparently accurate and completely separate records of their *75 expenditures for the farm and the home, and there is no evidence that they claimed any part of their normal personal living expenses as expenses of the farm. Furthermore, we think it is highly unlikely, and we found support for this from our observation of petitioners on the witness stand, that Herbert, who had worked hard most of his life putting himself through school and setting up a successful medical practice, would spend this much money on a venture such as this without expecting to get some return from it. And we are also doubtful that Gladys, with her background, would have been willing to work as hard as she did at operating this farm, unless she considered it a business which would eventually produce a profit. The above facts, together with others which appear in the record, with respect to petitioners' actions before going into the venture and their activities in connection with the operation of the venture, convincingly support their unequivocal testimony that they entered into and conducted this venture during the years here involved as a business with the motive and expectation of making a profit, and not as a hobby - and we have so concluded. The only arguments to *76 the contrary are based on the facts that during this time Herbert was heavily engaged in his medical practice and knew he could not devote all the time necessary to make the venture successful himself, and the fact that petitioners have suffered rather sizeable out-of-pocket losses on the venture each year they have operated it. While we recognize that the fact that one of the petitioners had little time to devote to the venure in the years involved is a factor to be considered in our decision, we do not think it is entitled to a great deal of weight here, and is certainly not controlling. See The evidence indicates that Herbert spent most of his spare time in activities related to this venture and, because of his background and experience, he could accomplish a lot in a short time - which he appears to have done. Also, Gladys had a good background for this business and it must have been understood that she would devote her full efforts to the venture - which she obviously did. With respect to the series of losses, as we have said before, this factor alone is not controlling, and, when viewed in the light of the other factors developed by the *77 evidence in this case, loses a good bit of its significance. It is pretty clear that anyone entering into the horse-breeding business in the manner petitioners did could expect losses for several years at least. They first had to establish their brood mares as good racing or jumping stock. This takes some time unless well known and expensive mares are purchased in the first place. And after the reputation of the brood mares and of the stable is established, it would normally take at least 3 years before the foals can prove out. The period of gestation is 11 months and the horses would seldom be shown or entered in races until they are yearlings at least, and preferably not until they are 3-year olds. When a horse stable or string is well established this may not hold true, but it would seem to have to be true when a venture such as this is inaugurated with very little back of it. Herbert testified that he expected to show a profit by 1964, and with luck he may do so. Furthermore, all is not as black (or in the red) with respect to this venture as it may appear to be. The uncontradicted evidence indicates that the value of the real estate acquired by petitioners for this venture in *78 1957 has about tripled, and that the potential value of the horses petitioners had on hand at the time of this trial was considerable. It may well be that while petitioners have realized annual cash losses, they may have unrealized appreciations in value which would at last equal those realized losses. While profits and losses must be computed on an annual basis for tax purposes, this is not necessarily true in determining whether there was a bona fide profit motive and a reasonable expectation thereof in a business venture such as this. See We hold for petitioners on this issue; but to permit adjustments on other issues agreed to by the parties, Decision will be entered under Rule 50. Footnotes
1. Petitioners and respondent have filed a "Memorandum of Agreement" which will be taken into account in recomputations under Rule 50.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
1. Attributable to Notorious, the first horse bought by petitioners. ↩
2. Value of property received in trade for two horses.↩
3. In his opening argument counsel for respondent for the first time suggested that petitioners' expenditures were at best capital expenditures made for the purpose of preparing to enter a business in the future, but this contention was specifically abandoned by respondent on brief.↩